## NOTICE TO CORPORATION OF CONTRACT OF EMPLOYMENT.

[Circuit Court of Lucas County.]

### JAMES PAUL v. CALDWELL FURNACE FOUNDRY CO.

Decided, March 11, 1905.

*Corporation—Re-organization of, under Laws of Different State—Notice to President of Contract of Employment—Ratification of Contract.*

1. Notice to the president of a corporation concerning a matter within the scope of his authority is notice to the corporation.
2. Where a corporation enters into a contract of employment, and shortly thereafter a new corporation is organized under the laws of a different state, and this new company takes over the business and property of the old company, and retains the same officers, and permits the party with whom the contract of employment was made to proceed with his work for several months, the knowledge of the president as to the term of the contract becomes the knowledge of the new company, and its action in continuing the other party to the contract in its employment is a ratification of the contract.

HULL, J.; HAYNES, J., and PARKER, J., concur.

This action was brought by Paul against the furnace company to recover nearly $1,000 damages which he claims he has sustained on account of a breach of contract for Paul's services. At the conclusion of the plaintiff's evidence the court below directed a verdict in favor of defendant. Judgment was entered in due course and reversal is sought here.

There were various grounds upon which the court of common pleas sustained the motion to direct a verdict; but upon the motion for a new trial the action of the court in overruling the motion was based upon one ground—that no contract had been entered into between plaintiff and defendant—and that is the ground relied upon in this court by defendant in error to sustain this judgment and none other need be mentioned in this opinion. The claim is made that the company with which Paul contracted went out of existence before he entered upon his duties, and that the company for which he performed the duties and from which he is claiming this money, never made a con-

tract with him, had no privity with him, and are not liable to
him. The contract was in writing, was executed on March 14,
1902, and is signed, "The Caldwell Furnace Foundry Company,
by James W. Caldwell, President."

The testimony shows that two days before this contract was
made, a corporation of this same name organized under the
laws of West Virginia and elected directors. They were in-
corporated on March 12, but did not organize until about two
weeks later, March 29, when they elected a board of directors
and officers. The original company, the one in existence when
this contract was made, was organized under the laws of West
Virginia. The other company seems to have been incorporated
originally under the laws of West Virginia, but on March 29
this West Virginia corporation became a New Jersey corporation
and these officers and directors were elected for that corporation,
retaining the old name of the West Virginia corporation, the
same officers and the same president.

All of the property of the West Virginia corporation was
taken over by the New Jersey corporation; they went through
the form, as one of the officers testifies, of a sale of the property
of the West Virginia corporation to the New Jersey corporation.
The West Virginia corporation went out of existence, at least so
far as owning any property was concerned or having any visible
existence, and the New Jersey corporation took its place. The
reason for this change, apparently, was, that they preferred to
do business under the laws of the state of New Jersey instead of
those of West Virginia. As I have said Caldwell still remained
president; the same name was retained and the same business
carried on at the same place—the only change made was, that
they were organized under the laws of New Jersey instead of
West Virginia.

Paul had made this contract on March 14, fifteen days before
this reorganization occurred. The contract was, that he was to
have $1,700 a year as managing salesman of this concern, which
was engaged in the manufacture and sale of heating and venti-
lating apparatus, but besides this $1,700 per year, to be paid
monthly, he was to have certain commissions based upon the
amount of sales of the company, and a certain amount of the

stock of the company.  He went to work under the contract
April 1, the day after the reorganization of the company.  He
had no knowledge nor notice of this reorganization during all
the time that he remained in the employ of this company.  He
was hired for one year.

On November 12, 1902, about six months after his contract
commenced, he was discharged, without any ground except that
they did not need him any more.  He had been paid his salary
monthly, $141.66, by this reorganized company.  The commis-
sions were not due and payable until at the end of the year.
His duties were the same as specified in this contract.  He went
about the country here and there.   A lot of correspondence
is put in evidence to show what communications were made and
as to the new company.  Caldwell had full knowledge of this
contract and signed it, and he remained president of the com-
pany until July, 1902, when he was succeeded by a man named
Sutton, who called Paul into the office and told him that he de-
sired him to remain with the company and perform the same
services, except that he wanted him to go out on the road more
than had been his habit previously; his pay continued, and he
was paid under Sutton's directions up until November, when he
was discharged.

Caldwell testifies that he employed this man.  He says there
was no resolution of the board of directors to this effect but that
he had full authority in the matter—he was in fact general
manager as well as president of the company and appears to
have had full authority to manage the company.

The claim is, that the New Jersey corporation never employed
Mr. Paul; that the notice and knowledge of Mr. Caldwell of the
making of this contract having accrued or been given before he
became president of the new corporation, that that would not be
notice to the new corporation—that they would not be bound
by this contract.

We think this claim is untenable; that there was evidence
here strongly tending to show that the new corporation had
notice and knowledge of this contract.  It is claimed by the
plaintiff in error that they adopted it and ratified it and are
bound by it the same as though they had signed it; and under

the evidence as it is now in the record it seems to us that this is correct. The only way in which knowledge can come to a corporation, ordinarily, is through its agents and officers. In order to give notice to such a corporation it is not necessary to have a meeting of its board of directors in regular session and notify them by writing or parol; but notice to a president of a corporation, acting within the scope of his authority and in accordance with his duties, is notice to the corporation. As is said in Cook on Corporations:

"It is well settled that a corporation is not chargeable with knowledge of facts merely because those facts were known to its incorporators, or stockholders, or clerk. But the corporation has notice of facts which come to the knowledge of its officers or agents while engaged in the business of the corporation, provided those facts pertain to that branch of the corporate business over which the particular officer or agent has some control."

And Thompson on Corporations:

"The most comprehensive rule with reference to this subject which can be stated is, that notice communicated to, or knowledge acquired by, the officers or agents of corporations, when acting in their official capacity or within the scope of their agency, becomes notice to, or knowledge of, the corporation, for all judicial purposes."

Now that Mr. Caldwell had notice of this contract when he was acting as president of the West Virginia corporation—of a contract that he made and signed—is clear. That he had notice of it after he became president of his New Jersey corporation— actual notice—is clear; and according to the testimony, it was within his power to employ men or discharge them under the new corporation. He was the manager of the company, and we think notice to him of the contract after he became president of the new corporation would be notice to the company. The change in the corporation was only a change in the state under which it was incorporated; there was no other reason given for it than as Mr. Caldwell says: "Why we changed our company from West Virginia laws to New Jersey laws—a New

Jersey corporation—and transferred all the property and the business and everything we had over from the one corporation to the other; quit doing business under West Virginia laws and commenced under New Jersey laws that day.'' In speaking of his successor, Mr. Sutton, as to what Paul did, he is asked: ''Did he act for the corporation after the change was made?'' And he answers: ''I think he commenced his employment after the change was made; my recollection is he commenced April 1, but I am not sure about it. If he went to work before, he continued right along, but I think his actual work commenced April 1, or about that time.'' The new company was incorporated on March 29. And he is asked: ''You knew of his being paid, did you?'' And he answered: ''All of our help was paid.'' ''Who had the entire management of the New Jersey corporation after that time?'' Answer: ''I had the management of it, both corporations, the old and the new; under the board of directors.'' And he was asked: ''How long did you continue to manage the affairs of the new corporation?'' Answer: ''Until July 3, 1902.'' That is when Sutton went in. Then, on the next page of the record, he is asked this: ''Was there any resolution of the board of directors pertaining to that contract passed before you executed it?'' A. ''No, sir, it came within my authority to make sales, and all that sort of thing.''

To permit the New Jersey corporation to escape liability under this contract, it seems to us, would be working a fraud upon Mr. Paul. They retained him in their employ; they recognized, adopted and ratified his contract so far as they could do so without saying that to Paul in so many words. They paid him. He did his work and nothing was said—no notice was given to him that any change was made. He had no knowledge nor notice of the reorganization, and they are to be presumed to know that —and they had no reason to suspect that he knew anything about any change in the corporation. To permit them to ''take over,'' as they say, and go through the formalities of taking all of the property of every kind and description of the old corporation and assume no liability under such a contract as that, clearly can not be sustained. We think the evidence tended

strongly to show, and so far as this record shows, it did show that the New Jersey corporation acknowledged and ratified this contract.

The judgment of the court of common pleas, in our opinion, was erroneous, and will therefore be reversed.

*Seney, Johnson & Seney,* for defendant in error.